Filed 9/10/21  In re Amanda T. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Amanda T., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ILENE T.,<br><br>    Defendant and Appellant. | A161044<br><br>(Alameda County Super. Ct. No. JD-032096-01) |

Amanda T., now 12 years old, who had been sexually molested by her mother's live-in boyfriend, was ordered removed from her mother's custody and placed with her father in September 2020.  Ilene T. (Mother) appeals, alleging there was no substantial evidence to support the removal order.  We find there was substantial evidence and shall affirm the disposition orders.

## I.  BACKGROUND

### A. *The Facts*

Mother and Ray T. (Father) are a married couple but have been separated since 2015.  Before the initiation of this case, Mother, who is 51 years old, had primary custody of Amanda and her older brother, Spencer. The parents lived within a block of one another, so exchange of custody was

1

convenient. Mother was a geriatric social worker with a master's degree in social work. As such, she was a mandated reporter trained in reporting requirements. Father was disabled and did not work, so he usually picked up Amanda and Spencer from school. The children would do homework at Father's house until Mother got home from work. Father also took Amanda to her ice hockey practice twice a week, to Hebrew and Sunday school, and for overnights at his house every two weeks.

In September 2017, Mother met Jeff L., now age 46, and he moved in with her and the children in February 2018. He helped Mother with the rent by performing handyman tasks for the landlord. Jeff had used methamphetamine since about 2016. He also engaged in domestic violence in a previous relationship. Mother was aware of Jeff's history of being in jail, abusing drugs, and engaging in domestic violence, but she thought he was "over it."

In the early morning hours of January 14, 2020, Amanda, then age 10, who was sleeping naked in her own bed, crawled into bed with Mother and Jeff after becoming worried about going to sleep-away science camp the next day. Jeff was also naked, and Mother let Amanda snuggle in between the two adults. When Amanda woke up later that morning, she told Mother that Jeff had rubbed his penis up against her vagina and then had " 'wet' the bed." Mother testified at the jurisdiction hearing that she woke up and felt a wet spot next to her ear, and that's when Amanda told her that Jeff had wet the bed. Amanda demonstrated to Mother that Jeff's penis went about a quarter of an inch into her vagina. Mother thought the wet spot looked and felt like a semen stain, and from its location on the bed did not think it could have resulted from her own sexual activity with Jeff. After Amanda disclosed the

molestation, Mother did not think she seemed upset and drove her to science camp where she stayed for three days.

Mother confronted Jeff about Amanda's accusation, and he said he did not know whether he had rubbed his penis against Amanda's vagina. Mother was concerned she could get into trouble as a mandated reporter and did some research to find out if the alleged acts were illegal. Mother did not want to believe Jeff had done this, and she wanted to contain the fallout within herself without involving the authorities or impacting the family. She did keep it a secret, too, until the whole thing "got too out of control and too big." She told no one, not even Father or her parents, about Amanda's allegation for two weeks. Mother admits she was in denial and was minimizing the episode. After two weeks, Mother told a friend, and the friend told her to "do something about it." After three weeks, Mother finally went to the police. Jeff continued to live in the house during her delay.

Six months previously, Amanda had reported to Mother that Jeff touched her vagina while sitting on her bed and saying goodnight to her. When Mother asked him about it, Jeff did not deny it, yet Mother "thought it was nothing" and dismissed Amanda's report. Mother did not report the touching incident to the authorities. She later testified she knew what were reportable incidents for older adults, but did not know reportable incidents for children. Mother also said she did not report Amanda's complaint about inappropriate touching because she did not want to falsely accuse Jeff. She had never seen him touch Amanda inappropriately and thought Amanda was more likely to touch him and explore his body. She had witnessed Amanda do this and told her it was inappropriate.

Prior to this incident, Amanda had been hospitalized three times in February and March 2019 under Welfare and Institutions Code section

3

5150.[1]  She had cried, screamed, kicked, hit things, and threatened to commit suicide at the time of these hospitalizations, but she had never reported sexual abuse.  She once attempted suicide about a year before this incident.  At least one of the hospitalizations was the result of inappropriate sexual touching or sexual play with a peer at school.

As a result of the hospitalizations, Amanda had been evaluated for medication, and she received therapy, school counseling, biofeedback, and a special school plan for disabled students due to her "emotional disturbance."  Her psychiatrist had prescribed Prozac and Guanfacine for her for mood and anxiety issues.

On February 4, 2020, Mother reported the January 14 incident to the police and to the Alameda County Social Services Agency (Agency).  On the same day, she told Jeff he needed to make plans to move out.  She was coming to understand he had pushed his way into her home.  Later that day, Amanda was interviewed at the Child Abuse Listening, Interviewing and Coordination Center (CALICO).  Amanda told the interviewer she usually sleeps naked, and the night before going to science camp, she got into Mother's bed and woke Mother.  It was Mother's idea that she sleep in the middle of the adults so she would not fall off the bed.  Jeff was naked and Mother had on underwear and a shirt.  After Mother fell back asleep, Amanda was facing toward Jeff, and Jeff put his "pee-hole" into her "pee-hole."  He used his hands to pull her towards himself repeatedly as she changed her position in the bed.  She thought he then urinated, but Mother told her the wetness was something else.  In the morning she told Mother, who told her not to worry while she was away at camp.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

4

Jeff continued to live in the home after the incident, but Mother would not let Amanda sleep in the adults' bed or allow her to be alone with Jeff. Amanda had seen Mother shaking because she was nervous around Jeff, but Mother said if he moved out their rent would go up. Amanda had not told anyone else what had happened with Jeff.

Amanda also told the CALICO interviewer that in August 2019, she went into Mother's bed while Mother was in the bathroom getting ready for bed. Jeff was wearing sweatpants, and Amanda could not remember if she was naked or wearing underwear. She was watching videos on the phone, and Jeff pulled down his sweatpants so his penis was exposed and put it into her "butt." Mother came into the room and took Amanda back to her own bedroom. Mother later testified that she did not know of this sodomy incident until after the CALICO interview.

On February 4, 2020, a warrant was issued for Jeff's arrest on the basis of Mother's report and Amanda's interview. Jeff was taken into custody the next day. When he was arrested, he had more than five grams of methamphetamine and a meth pipe in his possession. Mother and Spencer told the police that Amanda frequently walked around the house naked. Jeff admitted Amanda sometimes slept in the bed with him and Mother and admitted he had slept naked with her in the bed. He admitted observing the wet spot as described by Amanda, denied acting with intent, and said he did not know if Amanda was lying. The police issued an emergency protective order for Amanda. When the police arrived to arrest Jeff, Mother admitted she knew of Jeff's past domestic violence and other history, but she did not think he currently used drugs or alcohol and claimed she had seen no red flags.

5

On February 5, 2020, Father said he had not been aware of Amanda's allegations of sexual abuse against Jeff until after Mother reported it to the police. He said he was prepared to provide care for Amanda. On February 4, 2020, Amanda was taken into protective custody and was released to Father on February 6, 2020. Spencer was deemed not to be at risk and continued living with Mother.

## B. *The Dependency Proceedings*

### 1. The Petition and Detention

On February 6, 2020, the Agency filed a petition under section 300, subdivisions (b)(1) and (d), alleging Amanda was at substantial risk of physical or emotional harm or sexual abuse due to Mother's failure to protect her from sexual abuse by Jeff, occurring on January 14, 2020, reported to Mother by the child after the child had previously reported sexual abuse by Jeff six months prior, yet Mother failed to report it until February 4, 2020. On February 7, 2020, the juvenile court detained Amanda from Mother and released her to Father (who was declared the presumed father). The court directed Mother to have visitation supervised by Father until therapeutic visitation could be arranged, and then it was to be limited to therapeutic visitation.

### 2. Jurisdiction

The social worker's jurisdiction report dated February 27, 2020, recommended the juvenile court sustain the petition and provide family maintenance services to Father and Amanda. The social worker recommended that Amanda participate in mental health services to process her sexual abuse and to monitor ongoing contact between Mother and Amanda.

The social worker listed as concerns that Amanda has a history of mental and emotional health issues, Mother reported difficulty getting Jeff to

6

move from her home over a period of time, Mother did not tell Father or others about the sexual abuse until her disclosure in February 2020, and Mother lacked insight and judgment to avoid placing Amanda at risk of further sexual abuse.

The social worker referred Mother for individual therapy, of which Mother promptly availed herself. On May 8, 2020, Mother obtained a five-year domestic violence restraining order protecting herself and her two children from Jeff. By the end of May 2020, Mother had completed a 32-hour online parenting class.

At the contested jurisdiction hearing on July 30, 2020, Mother testified she was no longer in a relationship with Jeff. As a social worker herself, Mother acknowledged she was a mandated reporter and had received training as such. She testified she saw no sign that Jeff was an abuser but admitted he took Amanda to stores and bought her gifts. After Amanda reported the abuse, Mother read up on grooming behavior by child abusers and realized this could have been grooming behavior. Amanda, too, told the CALICO interviewer that Jeff used to be really nice to her and buy her things, but in the past week or two, he wasn't so nice anymore.

Mother testified that Amanda had engaged in yelling, screaming, and hitting things, leading to a psychiatric hold when she was nine years old. Amanda reported that a friend made her pull down her pants at her home, which apparently led to the first section 5150 commitment. Amanda was hospitalized under section 5150 on three occasions because she wanted to "jump out the window." These events occurred in February and March 2019, after Jeff had moved into the home. In response, and after having trouble locating a new psychiatrist to treat her, Mother and Father started Amanda

with neurofeedback in October 2019, and she had visits with the school psychologists.

According to Mother's testimony, on January 14, 2020, she awoke to a wet spot on the bed by her ear and Amanda told her Jeff had peed. Mother denied that Amanda told her Jeff had engaged in vaginal or anal intercourse with her; she testified she learned of that allegation in February 2020 from the police and social service reports. Mother said Amanda told her Jeff's penis touched her and he peed on the bed. She told the police that Amanda told her Jeff's penis went into her vagina a quarter of an inch and, when asked by the court, said she would not consider that intercourse. She admitted allowing Amanda naked in bed with the couple was not "the best idea," but she trusted Jeff. Mother felt she had no role in the abuse.

When Mother was asked at the hearing about Amanda's report that Jeff had touched her vagina while putting her to bed, Mother said she thought Amanda was describing Jeff's penis accidentally brushing against her, not an intentional act. She thought Jeff was fully clothed and they were just "snuggling." Mother's testimony was inconsistent with her earlier admission to the social worker and the police that Amanda told her Jeff had touched her vagina while putting her to bed.

Mother did not initially report the "touching" or "brushing" incident because she thought it was "innocent" and did not want to jump to conclusions with so little information. She noted Amanda was historically suicidal and emotionally fragile, and Mother apparently did not know whether to trust her account of the events. When Mother reported the abuse in February 2020, she suspected it was intentional conduct, but she emphasized in her report to the police and her testimony that it was only "suspected" abuse. She also noticed Jeff's behavior had changed after

8

January 14, so she did not allow him to be in the same room alone with Amanda starting about a week after the incident.

The juvenile court sustained the petition and found Amanda was a dependent child under section 300, subdivisions (b) and (d). The court made a negative credibility finding with respect to Mother's testimony. Visitation between Mother and Amanda was limited to therapeutic visitation.

### 3. Disposition

The Agency had filed a July 30, 2020 addendum report before the jurisdiction hearing, but due to lack of notice to Mother, the court did not consider that report until the disposition hearing on September 17, 2020. In the report, the social worker noted that in March 2020, Father expressed concerns regarding Amanda's contact with the district attorney handling Jeff's case because Amanda had been hitting her head against the wall due to stress from the criminal prosecution of Jeff and from peer conflicts at school. Amanda told the social worker she felt safe and comfortable with Father. She was attending online schooling during the pandemic, weekly therapy, ice hockey practice with her coach, and visits with Mother. In May, Amanda completed her school year, and through July 2020, she continued attending weekly video therapy and monthly psychiatric care to monitor her medication. By the end of July, Amanda's self-defeating statements had decreased and she was not banging her head or becoming overly emotional when frustrated.

In the same report, the social worker noted that Mother had obtained a restraining order against Jeff, who remained in custody, and had formally evicted Jeff from her home. Mother was attending weekly individual therapy by phone and said she had developed an understanding of grooming, of which she had previously been unaware. Mother said she now understood she

should not have allowed Amanda into the adults' bed when Amanda was nude. Mother claimed she had tried to get Jeff to move out in September 2019, due to his inattentive treatment of her, but he refused.

Mother thought she had been "very protective" of Amanda; she had always told Amanda not to let a grown person touch her, and she "trusted Amanda too much." She had not reported the abuse because of Amanda's history of suicidal tendencies and overwrought behavior, her lack of specificity, and her desire not to talk about it. Mother said she had wanted to call the authorities but worried that Jeff might be innocent. If Amanda had been more specific, she claimed she would have reported it.

The Agency filed an addendum report September 15, 2020, noting that Mother and Amanda had been referred to The Gathering Place for supervised visitation, and they had completed two supervised video chat sessions which were required before in-person visitation could take place. Those visits had gone well.

At the end of July 2020, Amanda's therapist reported that Amanda was not ready for family therapy as she was still unwilling to talk about the abuse or her feelings toward Mother. Amanda felt a great sense of responsibility for the abuse, was suffering from anxiety, and was having nightmares. A week before the disposition hearing, the same therapist again said Amanda was not ready for family therapy but was beginning to open up during sessions. Amanda had started saying she did not want to continue therapy, though, and the therapist was concerned the parents might be sabotaging the therapeutic process by saying therapy was "too slow." The social worker was concerned that Mother continued to minimize the abuse, to place responsibility on Amanda, and to lack insight. Father had difficulty setting

limits with Mother, and because he needed help with childcare, he tended to put that need ahead of Amanda's emotional welfare.

At the disposition hearing, Mother testified she had learned through the services provided by the Agency about coparenting skills, parenting skills, protecting her daughter, and maintaining boundaries in relationships. Mother said she would now report immediately if Amanda said the same things to her, even if she questioned the veracity of the report due to Amanda's age and history. Mother said she would not bring men into her home so long as her children lived with her.

Mother claimed she realized after the jurisdiction hearing that she should not have let Amanda come to bed with her and Jeff just because she was tired from being busy. She said being busy was one of her excuses and part of the reason for not wanting to report. Mother said her failure to report the touching incident in the summer of 2019 was partly due to Amanda's having given her barely any information. She said she started to believe Amanda's report of the molestations after the CALICO interview. Mother believed she was ready to resume custody of Amanda, but because her job would not allow her to provide full-time supervision, she was agreeable to splitting custody with Father.

The juvenile court declared Amanda a dependent child and ordered removal from Mother after finding by clear and convincing evidence that returning Amanda to Mother's physical custody would cause a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" and there were no reasonable alternative means to protect Amanda (§ 361, subd. (c)(1)) due to unreported sexual abuse by a member of the household (*id.*, subd. (c)(4)). The judge said she had some "issues with the mother's credibility" in her testimony about belatedly finding

11

out this was a reportable event and said she "just [didn't] find the mother's testimony credible." The judge continued Amanda in the custody of Father and ordered supervised visitation between Mother and Amanda at least twice a week. The judge found Mother was not entitled to reunification services under section 361.2, subdivision (b)(3) (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20–21), but ordered that Mother be provided informal child welfare services at the discretion of the Agency. The court ordered both parents to comply with the case plan and set future hearings for review under section 364. Mother timely appealed.

## II. DISCUSSION

Mother's sole contention on appeal is that the juvenile court lacked sufficient evidence for its order removing Amanda from her custody. To order removal from parental custody at a disposition hearing, the juvenile court must find by clear and convincing evidence that one of the circumstances specified in section 361, subdivision (c) applies, including subdivision (c)(1), found by the court at disposition. To remove a child from a parent's custody under that subdivision, the juvenile court must find by clear and convincing evidence that: (1) there is a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if the child is returned home, and (2) there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1); *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) Section 361, subdivision (c)(4), also allows removal if "[t]he minor . . . has been sexually abused . . . by a . . . member of his or her household, or other person known to his or her parent, and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from his or her parent." Here, the court found removal of Amanda

12

from Mother's custody was necessary for the reasons set forth in the Agency's reports, outlined above.

On review of the removal order, we apply the substantial evidence test, bearing in mind the heightened standard of proof that applies in the trial court. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 123; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 694–695; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) " ' "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

To justify removal, the parent need not be dangerous, and the child need not have been actually harmed. The focus of the statute is on averting harm to the child. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) "In this regard, the court may consider the parent's past conduct as well as present circumstances." (*Ibid.*) Risk to a child's physical health and safety may be inherent in the absence of adequate supervision. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1650.) A parent's denial about family problems is also a relevant factor to consider. (*Id.* at pp. 1657–1658.) "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*Cole C.*, at p. 918.) A mother's disbelief of her daughter's claims of sexual abuse may support a removal order. (*In re D.C.* (2015) 243 Cal.App.4th 41, 46–48, 55–56, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)

The evidence in this case supports the trial court's findings and orders. Amanda self-reported sexual abuse to Mother but was at first disbelieved and treated dismissively. To say Mother exercised poor judgment is an understatement. On one view of the evidence, she practically facilitated the abuse by placing her naked 10-year-old daughter in bed next to her naked 45-year-old boyfriend even after she had been told six months earlier he had touched the child's vagina while putting her to bed. Mother not only failed to report the abuse but disbelieved her daughter and apparently worried more about falsely accusing her boyfriend than she did about maintaining Amanda's safety. When Amanda told her plainly Jeff had rubbed his penis against her vagina, Mother's first reaction was to research whether that was illegal. She instinctively feared she might get into trouble for failing to report Amanda's allegation and seemed more worried about that than about the abuse.

Mother allowed Jeff to stay in the house for another three weeks, though perhaps she became more vigilant, until after Amanda's CALICO interview, when the police removed him. Even after Amanda told her about the January 14 molestation, Mother minimized the extent of the abuse by suggesting Amanda never told her Jeff had "intercourse" with her. And her definition of "intercourse" so as to exclude a man's insertion of his penis a quarter-inch into a child's vagina was certainly foreign to anyone trained in the law. (Pen. Code, §§ 261, 263; *People v. Earp* (1999) 20 Cal.4th 826, 888 [sexual intercourse is the penetration, " 'however slight,' " of a vagina by a penis].) Yet, when her daughter turned to her for help, she effectively donned blinders.

We disagree with Mother that the court's removal order was based on nothing but speculation. She cites *In re Steve W.* (1990) 217 Cal.App.3d 10,

14

which involved an order removing an infant from the mother's care after the father had been convicted of killing an older child. (*Id*. at pp. 12–15.) The mother testified she had no intent of resuming her relationship with the father. (*Id*. at p. 15.) The appellate court found the removal order had been improperly based on "speculation" that the mother "would enter a new relationship with yet another abusive type of person." (*Id*. at pp. 16, 22.) In *Steve W.*, however, the mother, though aware of the older child's injuries, had received an explanation for the injuries which a doctor testified would have been believable to an untrained person. (*Id*. at p. 21.) Moreover, the infant in *Steve W.* had not been abused himself, and the mother was not guilty of the kind of emotional betrayal that was involved in this case. Here, the court had substantial evidence of Mother's failure to supervise Amanda's interactions with Jeff and of real harm to Amanda, both physical and emotional. Jeff offered no explanation and did not even deny the abuse, yet it was not clear by disposition if Mother understood and owned her role in the crisis.

At the time of the disposition, Amanda still was not ready to engage in family therapy because she was just starting to show more trust and open up in individual therapy, although she was ambivalent about therapy. Amanda was doing better in Father's care, and she engaged in balanced activities, but the Agency's reports suggest she had not yet had time to heal emotionally from Jeff's molestation and Mother's apparent lack of concern about it and disbelief of her reports. Amanda had not fully processed the sexual violation or worked through feelings of anger or abandonment she felt towards Mother. Until Amanda becomes more stabilized, the trial court was justified in finding, by clear and convincing evidence, that she remained at risk and should be removed from Mother's care to permit her own mental recovery.

Mother continued to minimize the abuse, she placed responsibility on Amanda for her own failings, and she lacked insight into the damage she had done to Amanda by refusing to believe her and delaying the report of the molestations. The trial court was justified in concluding Mother had not fully comprehended by the time of the disposition hearing what she had done wrong or how to avoid the same error again, for she continued to blame Amanda's lack of specificity and reluctance to talk about the abuse for her own lack of vigilance. Mother believed she had no role in the abuse, but the juvenile court had evidence to support a contrary finding.

Despite Mother's rather egregious lapses in judgment, we see no reason to doubt her stated concern for Amanda's welfare and her declared resolve to avoid such lapses in the future. Jeff has been removed from the household and there is no basis to assume Mother will ever permit a recurrence of the circumstances leading to the institution of these proceedings. It is incumbent on Mother to demonstrate that she is now prepared and capable to ensure that Amanda will feel safe and protected if she regains custody, and the court must take into account the possibility that extended estrangement from Amanda may itself have negative effects on the minor. Thus, although we find evidence to support the juvenile court's conclusions, close oversight is critical to ensure that the separation does not extend beyond the point that it is no longer in Amanda's best interest.

### III. DISPOSITION

The disposition orders filed September 17, 2020, are affirmed, including the order removing Amanda from Mother's custody and placing her in Father's care.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

16